## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
## OWENSBORO DIVISION

**CIVIL ACTION NO.  4:06CV-122-M**

**FIFTH THIRD BANK**                                                      **PLAINTIFF**

**VS.**


**LINCOLN FINANCIAL SECURITIES**
**CORPORATION**                                                          **DEFENDANT**

### MEMORANDUM OPINION AND ORDER

This matter is before the Court on cross-motions for summary judgment by Plaintiff, Fifth

Third Bank, [DN 58] and Defendant, Lincoln Financial Securities Corporation, [DN 53].  Fully

briefed, this matter is ripe for decision.  For the reasons set forth below, the motion by Plaintiff, Fifth

Third Bank, for summary judgment is granted and the motion by Defendant, Lincoln Financial, for

summary judgment is denied.

### I. STANDARD OF REVIEW

In order to grant a motion for summary judgment, the Court must find that the pleadings,

together with the depositions, interrogatories and affidavits, establish that there is no genuine issue

of material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ.

P. 56.  The moving party bears the initial burden of specifying the basis for its motion and of

identifying that portion of the record which demonstrates the absence of a genuine issue of material

fact. Celotex  Corp. v. Catrett, 477 U.S. 317, 322 (1986). Once the moving party satisfies this

burden, the non-moving party thereafter must produce specific facts demonstrating a genuine issue

of fact for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  Since the parties

do not dispute the material facts in this case, summary judgment is an appropriate means of

resolving the legal issues underlying this dispute.

## II. BACKGROUND

In November of 2005, Schneider Consulting, LLC, sought to borrow Three Million Dollars ($3,000,000.00) from Plaintiff, Fifth Third Bank.  In order to secure this loan, Fifth Third Bank required Shaun S. Schneider and Chandra L. Schneider to pledge securities held in a brokerage account managed by Defendant, Lincoln Financial Securities Corporation.  Schneider submitted to Fifth Third Bank fraudulent brokerage account statements which he altered to reflect a balance of the brokerage account in excess of $3.2 million.  The Schneiders executed and delivered a Brokerage Account Pledge and Security Agreement dated December 21, 2005 to Fifth Third Bank.  The Brokerage Account Pledge and Security Agreement secures the Master Commercial Revolving Note dated December 21, 2005 in the original principal amount of Three Million Dollars executed by Schneider Consulting in favor of Fifth Third Bank.  The closing on the loan was held on December 21, 2005, and the loan was funded on December 22, 2005.

To perfect the security interest in the brokerage account, Fifth Third Bank required the Schneiders and Lincoln Financial (as holder of the account) to execute an Account Control Agreement.  The Account Control Agreement was signed by Fifth Third Bank and the Schneiders at the closing of their loan.  Fifth Third Bank mailed the Account Control Agreement to Lincoln Financial for signature.  Lincoln Financial initially rejected the Account Control Agreement because: (1) boilerplate language required by Lincoln Financial was not included in the Account Control Agreement, (2) there was a question about an account number, and (3) the balance reflected in the Account Control Agreement was higher than Lincoln Financial's records for the Account. (Rob Bingham Deposition at 123-125; Anne Jones Deposition at 10-11.)  Lincoln Financial sent the

2

Account Control Agreement back to Fifth Third Bank for revisions.  Rob Bingham, Vice President for Commercial Lending for Fifth Third Bank, contacted Schneider about the problems with the Account Control Agreement on December 29, 2005.

On December 29, 2005, Shaun Schneider delivered a check for $2,800,000 to Jeremy Tincher, a Lincoln Financial registered representative and Schneider's broker, and on December 30, 2005, Mr. Tincher mailed the check overnight to Lincoln Financial.  On December 29, 2005, Anne Jones, Lincoln Financial's Manager of Brokerage Services, sent an email to Mr. Bingham enclosing the language Lincoln Financial required to be included in the Account Control Agreement.  On December 30, 2005, Mr. Tincher emailed Mr. Bingham informing him that:

> I have attached the exact verbiage that JP will require to be in the agreement.  This wording has to be included in the agreement exactly or JP will deny the assignment again. Also, the accounts were somewhat messed up on form. The CNL REIT is not pledgable through this agreement with JP.  But, it represents only $20,000 of the total.  I have arranged it where all pledgable securities will be under the account number 71G008486.  Sorry for the confusion here.

(Tincher December 30, 2005, email.)  Mr. Tincher sent another email to Mr. Bingham on January 3, 2006 stating that Mr. Bingham should use a new account number and that the estimated value of the account as of January 3, 2006 is $3,211,000.  The revised Account Control Agreement was resigned by Fifth Third and the Schneiders and forwarded to Lincoln Financial for signature.  On or about January 3, 2006, Mr. Bingham also spoke personally with Anne Jones who verified that she received the revised Account Control Agreement, that she confirmed that the account was valued at $3.2 million, and that she informed him that a check had been deposited from Mr. Schneider  in the amount of $2.8 million.

Fifth Third Bank, the Schneiders, and Lincoln Financial executed the Account Control Agreement in question on or about January 10, 2006, with an effective date of December 21, 2005.

In the Account Control Agreement, Lincoln Financial represented and warranted to the Bank that the total market value of the property in the Schneider's brokerage account was at least Three Million Two Hundred Eleven Thousand Dollars ($3,211,000.00) on January 3, 2006, and that no distributions had been made between January 3, 2006 and January 10, 2006.  After it was signed, Ms. Jones initiated the re-registration of the Account Control Agreement to add Fifth Third Bank as a collateral party.  She also initiated restrictions on the account's transfer and asset movement.

According to Ms. Jones, once an account control agreement is executed, Lincoln Financial can transfer assets out of an account only if it receives a letter of instruction signed by both the Bank and the client.  Ms. Jones testified that normal trades within the account are different from asset transfers out of an account.  The Account Control Agreement restricts transfers of funds or securities out of the account, but permits normal trading which occurs in a brokerage account.  (Jones Deposition at 21-22.)  Additionally, Defendant's Compliance and Supervisory Procedures Manual states that once the Account Control Agreement is in place, "the account is restricted from effecting any trades, transfers and withdrawals until such time that an original LCA on company letterhead signed by an Officer of the financial institution releases the lien."  (Manual at 172-173.)

Michael Murray, Vice President of Lincoln Financial, testified that the $3,211,000.00 balance of the brokerage account included a large amount of securities purchased with the $2.8 million check written by the Schneiders.[1]  After the securities had been purchased and their value

_____

[1]Mr. Murray testified that to purchase securities from Lincoln Financial, a client contacts his Lincoln Financial registered representative who then enters the requested transaction with Lincoln Financial.  Once received by Lincoln Financial, the trade transaction is then called or entered electronically to Lincoln Financial's trade clearing firm, Pershing, LLC ("Pershing").  Pershing then executes the trade on behalf of Lincoln Financial.  The securities trades are considered purchased as of the date of the trade.  Thereafter, Lincoln Financial clients are allowed three business days in which to pay for or settle the trade.  Pershing, in its capacity as

4

added to the brokerage account balance, the $2,800,000.00 check used to fund the securities purchase was returned due to insufficient funds.  Lincoln Financial immediately informed the Schneiders of the check's return.  On January 16, 2006, the Schneiders deposited another check to cover the purchase of the securities.  The second check was likewise returned.  Lincoln Financial represents that when it learned that Pershing had not received good funds to support Schneider's purchases, it had three options: (1) order a cancellation of the trades; (2) purchase the trades; or (3) exhaust available Regulation T extensions to extend Schneider's time to deposit good funds.  In Schneider's case, all Regulation T extension requests were exhausted.  Lincoln Financial was then responsible to Pershing to cover the cost of the securities purchased in the Schneider Account.  To satisfy its obligations to Pershing, Lincoln Financial immediately ordered the cancellation of the trades and adjusted the brokerage account balance to reflect the cancelled transactions.  Mr. Murray testified that to "cancel the trades" means to "reverse, cancel, bust the transactions within the client

_____

Lincoln Financial's clearing firm, receives the financial instruments, reviews them and deposits them into accounts to fund securities purchases.  In the event the checks are not received or are deficient, Pershing notifies Lincoln Financial who in turn notifies its registered representatives for discussion with clients.  If after the settlement date a check deposited to an account has not been honored, the credit within the account will be removed and the account will hold a debit-balance awaiting funding to cover the purchase price of the securities. (May 21, 2009, Michael Murray Dep. at 19-38.)

     Mr. Murray testified that during the time between the purchase and the funding of the securities, Pershing, in its role as clearing firm and custodian for Lincoln Financial, retains ownership of the securities until they are paid for.  (Id. at 40.)  While Pershing retains ownership, Lincoln Financial is financially responsible to Pershing for purchases made within Lincoln Financial's client's accounts.  If a Lincoln Financial client does not pay for securities purchases, then Lincoln Financial must either pay Pershing for those securities or reverse the transactions and cover any potential decrease in market value from the time the securities are purchased until they are sold. (Lincoln Financial Sur-Reply at 6.)  Mr. Murray testified that when an error occurs or a transaction is not paid for, Lincoln Financial's policy is to order the sale of those securities immediately upon notification to avoid purchasing them or maintaining them in its own Account. (May 21, 2009, Murray Dep. at 41-41.)

account."  (May 31, 2007, Michael Murray Dep. at 14.)   Lincoln Financial represents that it explicitly retained the right to reverse unfunded trades within its clients' accounts pursuant to Section 13(I)(g) of the Brokerage New Account Form executed between it and the Schneiders which provides: "If upon the purchase/sale of securities by JPSC at your direction, you fail to pay for or deliver monies or securities, you authorize JPSC to take steps necessary to pay for/deliver such monies or securities.  You further agree to reimburse JPSC for any loss it may sustain on your behalf."  (Brokerage Agreement at 13(I)(g).)

By cancelling the Schneider trades, the balance in the Schneider account fell from at least $3,211,000 to approximately $450,000.  Lincoln Financial states that Fifth Third Bank's agent, Rob Bingham, was notified.  During this time, Lincoln Financial states that Mr. Schneider also informed Lincoln Financial that he was under investigation for bank fraud.  On January 19, 2006, the Federal Bureau of Investigations ("FBI") issued a Freeze Order on the brokerage account.  Lincoln Financial through Pershing liquidated and transferred the assets in the subject brokerage account to the United States Marshals Service pursuant to an order of the FBI.

Subsequently, Schneider Consulting defaulted on its loan with Fifth Third Bank.  By letter dated February 3, 2006, Fifth Third Bank directed Lincoln Financial to liquidate the balance of the brokerage account to satisfy the loan pursuant to the Account Control Agreement.  In 2007, Fifth Third Bank received two liquidation payments from Lincoln Financial in the total amount of $466,308.01.  Fifth Third Bank was also notified that it will receive an additional $17,610.92 from the account.

Fifth Third Bank alleges that Lincoln Financial breached the Account Control Agreement by (a) improperly representing or warranting that Schneider's Lincoln Financial Brokerage Account

6

had a market value of $3.2 million; or alternatively, (b) by cancelling trades made within Schneider's Brokerage Account without the Bank's permission. As a result of the alleged breach, Fifth Third Bank filed this motion requesting the Court to enter summary judgment in favor of the Bank and against Lincoln Financial in the amount of $2,727,081.07[2] reflecting the difference of the amount it would have received if the trades had not been cancelled by Lincoln Financial and the amount it actually received. Plaintiffs also seek prejudgment interest from March 3, 2006 until the date of the judgment herein, plus post-judgment interest until the amount due is paid.

In its cross-motion for summary judgment, Lincoln Financial argues that summary judgment should be granted in its favor because it did not breach the Account Control Agreement. First, Lincoln Financial argues that under the Account Control Agreement it accurately represented the value of the securities in the brokerage account at one snapshot in time, as of January 3, 2006. Second, Lincoln Financial also argues that nothing within the Account Control Agreement precluded Lincoln Financial from reversing the trades at issue once Schneider's funding failed. Third, Lincoln Financial maintains that the entire balance of the subject Brokerage Account was liquidated. Finally, Lincoln Financial also contends that summary judgment should be granted in its favor arguing that (a) the Account Control Agreement is unenforceable for want of consideration and lack of mutuality, (b) the Account Control Agreement must be rescinded based upon mutual mistake, and (c) the Account Control Agreement is subject to rescission by Lincoln Financial based upon Schneider's fraud.

---

[2]In response to Plaintiff's motion for summary judgment, Lincoln Financial did not dispute this figure.

## III. DISCUSSION

The Account Control Agreement is the subject of this civil action.  The stated purpose of the Account Control Agreement was "to provide for the control of the Brokerage Account and to perfect the security interest" of Fifth Third Bank.  (Account Control Agreement at 1.) Section 1 of the Account Control Agreement sets forth Lincoln Financial's representations and warranties to the Bank.  Among others, Lincoln Financial "represents and warrants" that "(a) the Brokerage Account has been established in the name of [the Schneiders]" and "(b) the total market value of the property of the Brokerage Account is at least Three Million Two Hundred Eleven Thousand Dollars and No Cents ($3,211,000) on the 3rd day of January 2006."  (Account Control Agreement at § 1.)  Lincoln Financial further warranted that no distributions had been made between January 3, 2006 and January 10, 2006.  Id.  Additionally, the Account Control Agreement provided that with the exception of any claims by the Schneiders or Fifth Third, Lincoln Financial "does not know of any claim to or interest in the Brokerage Account or in any financial asset carried therein."  (Id.)

Within Section 3 of the Account Control Agreement entitled "Priority of Lien," Lincoln Financial waived and released its rights to the brokerage account.  Specifically, Section 3 provides in part as follows:

> [Lincoln Financial] hereby waives and releases all liens, encumbrances, claims and rights of setoff it may have against the Brokerage Account or any financial asset carried in the Brokerage Account or any credit balance in the Brokerage Account and agrees that, except for payment of its customary fees and commission pursuant to the Brokerage Agreement, it will not assert any such lien, encumbrance, claim or right of the priority thereof against the Brokerage Account or any financial asset carried in the Brokerage Account or any credit balance in the Brokerage Account.

(Account Control Agreement § 3.)  Section 4 of the Account Control Agreement entitled "Control" permits Lincoln Financial to "make trades of financial assets held in the Brokerage Account at the

8

instruction of the Pledgor, or their authorized representatives" subject to the "restrictions in Sections 2 and 3." (Id. at § 4.) Pledgor is defined as Shaun Schneider and Chandra Schneider.

Under Kentucky law, "'in order to recover in any action based on breach of a contract, a plaintiff must show the existence and the breach of a contractually imposed duty.'" Abney v. Amgen, Inc., 443 F.3d 540, 547 (6th Cir. 2006)(quoting Lenning v. Commercial Union Ins. Co., 260 F.3d 574, 581 (6th Cir. 2001)).  The interpretation of a contract is a question of law for the court to decide. Equitania Insurance Co. v. Slone & Garrett, P.S.C., 191 S.W.3d 552, 556 (Ky. 2006).  "In construing a contract, a court's primary objective is to ascertain and to effectuate the intention of the parties to the contract from the contract itself." Logan Fabricom, Inc. v. AOP Partnership LLP, 2006 WL 3759412, *2 (Ky. App. December 22, 2006).  Absent an ambiguity, "[t]he intention of the parties to a written instrument must be gathered from the four corners of that instrument." Equitania Insurance Co., 191 S.W.3d at 556.  "A contract is ambiguous if a reasonable person would find it susceptible to different or inconsistent interpretations." Cantrell Supply, Inc. v. Liberty Mut. Ins. Co., 94 S.W.3d 381, 385 (Ky. App. 2002).  See also Lexicon, Inc. v. Safeco Ins. Co. of America, Inc., 436 F.3d 662 (6th Cir. 2006). "The fact that one party may have intended different results, however, is insufficient to construe a contract at variance with its plain and unambiguous terms." Cantrell Supply, Inc., 94 S.W.3d at 385.

**A.  Breach of Contract**

Fifth Third claims that by signing the Account Control Agreement, Lincoln Financial expressly represented and warranted that the Schneider account held at least $3,211,000 in assets and when Lincoln Financial cancelled the trades three weeks later, it breached the contract.  In response, Lincoln Financial argues that it did not violate the Account Control Agreement.  First,

9

Lincoln Financial contends that the brokerage account balance set forth in the Account Control Agreement was true and accurate as of the dates provided therein and represented only the market value of the securities in the account on these specific dates.  Second, Lincoln Financial argues that it did not violate Section 3 of the Account Control Agreement by cancelling the trades and adjusting the brokerage account pursuant to its rights under the brokerage agreement.  Lincoln Financial contends that this subsequent adjustment to reflect the brokerage account's true value does not reflect a payment, a withdrawal, a claim, or setoff against the brokerage account.  In further support of its argument, Lincoln Financial argues in its sur-reply that at no time did it or Schneider ever own the securities in question.  Instead, Lincoln Financial represents that its clearing firm, Pershing, retained ownership of the securities while awaiting Schneider's payment.  Thus, according to Lincoln Financial, it did not exercise a claim or setoff against the account by ordering the trade reversals.

Considering the evidence in the light most favorable to Lincoln Financial, the Court finds that Lincoln Financial breached the Account Control Agreement.  As discussed above, the purpose of the Account Control Agreement is to provide for the control of the brokerage account in question.  A review of the Account Control Agreement reflects that Lincoln Financial represented and warranted the value of the Schneiders' brokerage account of at least $3,211,000 as of January 3 and January 10, 2006.  Lincoln Financial further represented that it did not know of any claim to or interest in the brokerage account or asset contained in the brokerage account.  The Account Control Agreement prohibited Lincoln Financial from allowing any withdrawals from the account without Fifth Third's consent.  And, Lincoln Financial waived any claim that it had to the account, including setoff.

10

Given that at the time of the Freeze Order, the Schneider's brokerage account was valued at only \$450,323.00[3], it is clear from the record that Lincoln Financial breached the Account Control Agreement either by misrepresenting the true value of the brokerage account or by asserting a claim against the account to compensate itself or Pershing for the Schneiders' bad check. When Lincoln Financial warranted to Fifth Third Bank that the value of the property held in the brokerage account was at least \$3.2 million, the securities comprising the brokerage account had been purchased and placed in the brokerage account. At that point, pursuant to Section 3 of the Account Control Agreement, Lincoln Financial waived and released all liens, claims or rights of setoff against the assets in the brokerage account. As such, under the terms of the Account Control Agreement, when the Schneiders' check was returned due to insufficient funds, Lincoln Financial had no authority to remove the assets from the account without the consent of Fifth Third. The Court concludes that the cancelling the trades in question constitutes a breach of Section 3 of the Account Control Agreement. Additionally, Lincoln Financial's new argument that neither it nor the Schneiders ever owned the securities in question does not defeat Plaintiff's motion for summary judgment. If true, this fact would support Plaintiff's claim that Lincoln Financial breached the Account Control Agreement by representing and warranting that the brokerage account's value at the time of the execution of the Agreement was at least \$3.2 million.

Finally, contrary to Lincoln Financial's argument, a finding that Lincoln Financial breached the Account Control Agreement does not convert the Agreement into a guaranty for Schneider's loan and does not impose Schneider's loan obligations onto Lincoln Financial. Lincoln Financial

---

[3]Lincoln Financial represents that once the \$2.8 million dollar check was returned for insufficient funds, the adjusted balance of the account was \$450,323.00. Plaintiff has not challenged this figure.

is not liable to Fifth Third as a guarantor for the Schneider's loan.  Instead, Lincoln Financial is liable for breach of contract because it represented and warranted that the value of the account was $3.2 million, waived any claim or setoff against the brokerage account, and then permitted its staff or Pershing to cancel the trades and remove $2.8 million worth of securities from the brokerage account without the approval of Fifth Third in clear violation of the Account Control Agreement.

For these reasons, finding no genuine issue of material fact, the Court concludes that Lincoln Financial breached the Account Control Agreement.

**B. Consideration and Mutuality of Obligation**

Lincoln Financial argues that the Account Control Agreement is unenforceable because it lacks consideration.  Specifically, Lincoln Financial contends that completely lacking from the agreement is any benefit to Lincoln Financial provided in exchange for its promises or obligations.

Under Kentucky law, the term consideration is defined as "[a] benefit to the party promising, or a loss or detriment to the party to whom the promise is made."  Phillips v. Phillips, 171 S.W.2d 458, 464 (Ky. 1943).  See also Snyder v. Snyder, 235 S.W. 743, 746 (Ky. 1921)("A valuable consideration may be some benefit conferred upon the party by whom the promise is made, or upon a third party at his instance or request, or some detriment sustained, at the instance of the party promising, by the party in whose favor the promise is made."); Whitaker Bank, Inc. v. First Nat. Bank and Trust of London, 2008 WL 3165251, *2 (Ky. Ct. App. August 8, 2008)("Both benefit and detriment need not coexist before there is consideration"); Bankers Bond Co. v. Buckingham, 97 S.W.2d 596, 601 (Ky. 1936).

The Court finds that sufficient consideration exists to support the Account Control Agreement.  The evidence satisfactorily shows that the Schneiders had become indebted to Fifth

12

Third and had executed a note and account control agreement.  In an effort to perfect the security interest in the brokerage account, Schneiders requested Lincoln Financial to execute the Account Control Agreement.  At the request and for the benefit of its customers, Lincoln Financial warranted and represented the balance of the brokerage account and waived any right of setoff in the account or assets contained in the account.  In exchange for this promise, Lincoln Financial retained its customers and continued to receive the corresponding fees and commissions payable under the brokerage account agreement.  Contrary to the argument by Lincoln Financial, the continued maintenance of a customer account is sufficient consideration for the execution of an account control agreement between a client, a bank, and a brokerage firm even if the brokerage relationship is already established.  Vice President Murray's testimony supports this conclusion.  At his deposition, Mr. Murray admitted that Lincoln Financial lost customers as a result of it discontinuing the practice of accepting account control agreements. (Murray Dep. at 157-159.)  As such, the Court finds that the Account Control Agreement is supported by sufficient consideration.

Additionally, Lincoln Financial argues that the Account Control Agreement is unenforceable because it lacks mutuality of obligation.  Under Kentucky law, mutuality of obligation exists so long as the requirement of consideration is met.   Ramler v. Spartan Construction, Inc., 2003 WL 22064334, *5 (Ky. Ct. App. September 5, 2003).  See also Bradford v. Billington, 299 S.W.2d 601, 604  (Ky. 1957)("[T]he requirement of mutuality of obligation in bilateral contracts comes into play only where a promise of one party is the *sole* consideration for the promise of the other.").  Having found that the Agreement is supported by sufficient consideration, the Court finds that mutuality of obligation exists.

### C. Mutual Mistake

Lincoln Financial contends that at the time of the execution of the Agreement, both Fifth Third and Lincoln Financial executed the Account Control Agreement laboring under a mutual mistake caused and induced by Schneider's intentional fraud.  Lincoln Financial submits that the parties executed the Account Control Agreement reasonably expecting that sufficient funding was available to support securities trading directed by Schneider within his brokerage account.  Based on its claim of mutual mistake, Lincoln Financial urges the Court to rescind the contract or reform the contract to recognize a reduction in the brokerage account value by $2.8 million based upon Schneider's fraud in that amount.

When parties enter into a contract under a mutual mistake, the contract is not enforceable. Hinton Hardwoods, Inc. v. Cumberland Scrap Processors Transport, 2008 WL 5429569, *4 (Ky. Ct. App. December 31, 2008).  "'A mutual mistake is one in which both parties participate by each laboring under the same misconception.'" Id. (quoting Reiss v. Wintersmith, 44 S.W.2d 609, 613 (Ky. Ct. App. 1931)).  See also Frye v. Brown, 2007 WL 4465567, *3 (Ky. Ct. App. December 21, 2007)("Equity, however, will reform such instrument where the mistake is mutual; that is, a mistake reciprocal and common to both parties, as where there has been a meeting of the minds and an agreement actually entered into, but the written instrument does not express the real intention of the parties . . ., or because of a mistake of the draftsman of the instrument where the evidence is clear and convincing showing the mistake[.]")

> To vary the terms of a writing on the ground of mistake, the proof must establish three elements. See Campbellsville Lumber Co. v. Winfrey, 303 S.W.2d 284, 286 (Ky. 1957). First, it must show that the mistake was mutual, not unilateral. See id. Second, "[t]he mutual mistake must be proven beyond a reasonable controversy by *clear and convincing evidence*." Id. (emphasis in original). Third, "it must be shown that the parties had actually agreed upon terms different from those expressed in the

written instrument." Id.

Abney v. Nationwide Mutual Insurance Company, 215 S.W.3d 699, 704 (Ky. 2006). "It is simply not enough that one party intended a different result." Dupont v. Dupont, 2008 WL 4951777, *3 (Ky. Ct. App. 2008).

There is no evidence in the record indicating a mutual mistake that would permit reformation of this contract. The Account Control Agreement clearly reflects that Lincoln Financial represented and warranted that the brokerage account was valued at $3.2 million as of January 3, 2006 and January 10, 2006. Lincoln Financial does not contend that there was a mutual mistake regarding the account value. Instead, Lincoln Financial claims that the account balance was accurate on January 3, 2006 and that the mutual mistake related to the sufficiency of Schneider's financial resources to support the security purchases.

Nothing in the record suggests that Fifth Third was under any impression whatsoever regarding the sufficiency of the check tendered by the Schneiders to Lincoln Financial. Fifth Third did not have any involvement in the monitoring of the brokerage account, ascertaining the value of the brokerage account, or the decision to purchase securities without verifying the sufficiency of funds to support the purchase of those securities. It was Lincoln Financial, not Fifth Third, who was responsible for verifying that the funds tendered by the Schneiders were sufficient to purchase the securities. A review of the evidence reveals that the only mistake involved Lincoln Financial's reliance on an uncleared check in representing and warranting the value of the account. This, however, is no ground for avoidance of an enforceable contract based on the defense of mutual mistake.

Additionally, contract reformation or recision "is not available where the complaining party

negligently failed to detect the fraud or mistake." <u>Cartwright v. Manufacturers and Traders Trust Co.</u>, 2008 WL 5264277, *3 (Ky. Ct. App. December 19, 2008)(citation omitted).  "Kentucky's courts have insisted that the parties to a contract exercise "at least the degree of diligence which may be fairly expected from a reasonable person." <u>Id.</u>  <u>See also</u>  <u>Sae Biang Optical v. Kenmark Optical, Inc.</u>, 2008 WL 170069, *4 (W.D. Ky. January 17, 2008)("A party bears the risk of a mistake when (a) the risk is allocated to him by agreement of the parties, or (b) he is aware, at the time the contract is made that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient." Restatement (Second) of Contracts § 154); <u>Koam Produce, Inc. v. Dimare Homestead, Inc.</u>, 329 F.3d 123, 127-28 (2nd Cir.2003)(citing applicable New York case law).  "Courts of equity will generally give no relief to a complaining party where means of knowledge of the truth or falsity of the representations are at his hands. He will be presumed to have had knowledge." <u>Mayo Arcade Corp. v. Bonded Floors Co.</u>, 41 S.W.2d 1104, 1108 (Ky. 1931).

The determination of the actual account value was within the exclusive control of Lincoln Financial.  Anne Jones testified that as part of her job, she would verify the account balances before approving an account control agreement for signature.  Jones indicated that the documents she reviews includes recent activity in the brokerage account, including deposits of checks.  Lincoln Financial was aware of the recently deposited check and relied upon the uncleared check in representing and warranting the value of the account.  Lincoln Financial assumed the risk of loss by treating the check as sufficient, warranting the value of the account, and releasing all claims and rights of setoff against the account.  The means of knowledge of the actual account value was in the hands of Lincoln Financial.  Having negligently failed to ascertain the mistake, Lincoln Financial

is precluded from obtaining reformation or recision of the contract.

### D. Fraud

Lincoln Financial argues that the Agreement is subject to rescission based upon Schneider's fraud. Lincoln Financial argues that Schneider intentionally misrepresented his financial position to Fifth Third and artificially inflated his brokerage account by purchasing securities without sufficient funds. Lincoln Financial argues that it was an innocent victim of fraud and is entitled to void the Agreement and rescind the transaction.

A contract may be rescinded or voided on the basis of fraud. To establish a claim of fraud under Kentucky law, the plaintiff must prove: (1) a material misrepresentation; (2) which is false; (3) which was known to be false, or made recklessly; (4) made with inducement to be acted upon; (5) which is acted upon in reliance thereon; and (6) causes injury. Compressed Gas Corp. v. U.S. Steel Corp., 857 F.2d 346, 349 (6th Cir. 1988) (citing Wahba v. Don Corlett Motors, Inc., 573 S.W.2d 357, 359 (Ky. Ct. App. 1978)). However, as discussed above, it is well established that under Kentucky law that "equity will give no relief to a complaining party who has means of knowledge of the truth or falsity of representations at hand." McClure v. Young, 396 S.W.2d 48, 51 (Ky. 1965); Mayo Arcade Corp. v. Bonded Floors Co., 41 S.W.2d 1104, 1108 (Ky. 1931). See also Moore, Owen, Thomas & Co. v. Coffey, 992 F.2d 1439, 1447 (6th Cir. 1993).

Lincoln Financial cannot rescind the contract based on the defense of fraud. It is undisputed that Fifth Third neither participated in the fraud complained of -- the purchase of the securities without sufficient funds -- nor had notice of the alleged fraud when it executed the Agreement. The fact that the $2.8 million check had not cleared and, according to Murray, the fact that the securities were actually still owned by Pershing, put Lincoln Financial on notice either that the securities

17

contained in the account were not in fact owned by Schneider or that the value of the account was substantially less than $3.2 million. Lincoln Financial knew, or could have known, by the exercise of ordinary diligence that the account balance was in fact only $450,000 as a result of the uncleared check. As discussed above, "[t]he law will not interfere to protect one from the result of his own negligence." Mayo Arcade Corp., 41 S.W.2d at 1109. Thus, under these circumstances, the Court finds that as a matter of law that no reasonable juror could find that Lincoln Financial could have reasonably relied upon the uncleared check in representing and warranting the account balance. As such, Lincoln Financial cannot rescind the contract in question.

## IV. CONCLUSION

For the reasons set forth above, Plaintiff's motion for summary judgment [DN 58] is **GRANTED** and Defendant's motion for summary judgment [DN 53] is **DENIED.** The Clerk of the Court shall enter a judgment in favor of Fifth Third Bank against Lincoln Financial in the amount of $2,727,081.07, including prejudgment interest paid at 8% per annum from March 3, 2006, until the date of Judgment entered by this Court, together with postjudgment interest established at the United States Treasury Bill rate on the date of Judgment. A separate judgment shall enter concurrently herewith.

cc: counsel of record